# In the United States Court of Federal Claims

No. 13-698C
(Filed:  May 15, 2020)

```
*************************************
ARROWOOD INDEMNITY COMPANY    *
et al.,                       *
                              *
            Plaintiffs,       *
                              *
v.                            *
                              *
THE UNITED STATES,            *
                              *
            Defendant.        *
*************************************
```

Motion to Dismiss; RCFC 12(b)(1); RCFC 12(b)(6); Jurisdiction; Standing; Direct Claims; Instrumentalities; Coercion; Agent; Collateral Estoppel; Issue Preclusion; Conservators; Conflict of Interest; Third-Party Beneficiaries; Stock; Shareholders; Fannie; Freddie; FHFA

<u>Richard M. Zuckerman</u>, New York, NY, for plaintiffs.

<u>Kenneth M. Dintzer</u>, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Chief Judge

   Plaintiffs in this case challenge the actions of the United States during the conservatorships of the Federal National Mortgage Association ("Fannie") and the Federal Home Loan Mortgage Corporation ("Freddie").  Specifically, plaintiffs take issue with the conservator for Fannie and Freddie (collectively, the "Enterprises") amending a funding agreement between the Enterprises and the United States Department of the Treasury ("Treasury").  Based on the revisions to that agreement, plaintiffs seek the return of money illegally exacted, damages for breach of contract and breach of fiduciary duty, and compensation for a taking pursuant to the Fifth Amendment to the United States Constitution ("Constitution").  Defendant moves to dismiss plaintiffs' complaint, arguing that the court lacks subject-matter jurisdiction over plaintiffs' claims, plaintiffs lack standing to pursue certain claims, and plaintiffs fail to state a claim upon which relief may be granted.  For the reasons stated below, the court grants defendant's motion to dismiss.

## I.  BACKGROUND

**A.  The Enterprises are private companies that are under the control of a conservator.**

### 1.  The Enterprises operated independently before the financial crisis.

Congress created the Enterprises to help the housing market; the Enterprises purchase and guarantee mortgages originated by private banks before bundling those mortgages into securities that are sold to investors.[1]  2d Am. Compl. ¶ 28.  Congress chartered Fannie in 1938 and established Freddie in 1970.  Id. ¶ 29.  Both Enterprises were initially part of the federal government before Congress reorganized them into for-profit companies owned by private shareholders.  Id.  Freddie is organized under Virginia law, and Fannie is organized under Delaware law.  Fairholme II, 147 Fed. Cl. at 15.  The Enterprises, consistent with the applicable state laws, issued their own common and preferred stock.  2d Am. Compl. ¶ 30.  Common shareholders obtained the right to receive dividends, collect any residual value, and vote on various corporate matters.  Id.; Fairholme II, 147 Fed. Cl. at 15.  Those owning preferred stock, including plaintiffs in this suit, acquired the right to receive dividends and a liquidation preference.  2d Am. Compl. ¶¶ 30-31.

The Enterprises, up until the financial crisis in the late 2000s, were consistently profitable; Fannie had not reported a full-year loss since 1985, and Freddie had not reported such a loss since becoming privately owned.  Id. ¶ 32.  Although the Enterprises recorded losses in 2007 and the first two quarters of 2008, the Enterprises continued to generate sufficient cash to pay their debts and retained sufficient capital to operate.  Id. ¶ 33.  Otherwise stated, the Enterprises were not in financial distress or otherwise at risk of insolvency.  Id. ¶ 34.

### 2.  Congress created the Federal Housing Finance Agency to regulate the Enterprises and authorized the agency to serve as a conservator for each Enterprise.

In the midst of the financial crisis during the summer of 2008, Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654 (codified as amended in scattered sections of 12 U.S.C.).  In that statute, Congress created the Federal Housing Finance Agency ("FHFA") and provided it with supervisory and regulatory authority over the Enterprises.  See 12 U.S.C. § 4511(a)-(b) (2018).[2]  Congress further authorized the FHFA Director to, in limited circumstances, appoint the FHFA as the conservator

---

[1]  This background section is a less comprehensive version of the court's recitation of facts in a related case, Fairholme Funds, Inc. v. United States, 147 Fed. Cl. 1 (2019) ("Fairholme II"), motion to certify interlocutory appeal granted, 147 Fed. Cl. 126 (2020).

[2]  Congress has not amended the relevant portions of HERA since enacting the law in 2008.  The court, therefore, refers to the most recent version of the United States Code.

("FHFA-C") for each Enterprise to reorganize, rehabilitate, or wind up its affairs.[3]  Id. § 4617(a)(2).  Specifically, the Director is authorized to appoint a conservator if, among other things, an Enterprise consents, is undercapitalized, or lacks sufficient assets to pay its obligations.  Id. § 4617(a)(3).[4]  The conservator, once appointed, functions independently; it is not "subject to the direction or supervision of any other agency of the United States or any State in the exercise of [its] rights, powers, and privileges . . . ."  Id. § 4617(a)(7).

Congress also delineated the scope of the FHFA-C's powers in HERA.  See generally id. § 4617.  As soon as it is appointed, the FHFA-C "immediately succeed[s] to . . . all rights, titles, powers, and privileges of the [Enterprise], and of any stockholder, officer, or director of such [Enterprise] with respect to the [Enterprise] and the assets of the [Enterprise] . . . ."  Id. § 4617(b)(2)(A).  Congress also conferred on the conservator the power to "[o]perate the [Enterprise]."  Id. § 4617(b)(2)(B).  Pursuant to that power, the conservator "may," among other things, "perform all functions of the [Enterprise]," "preserve and conserve the assets and property of the [Enterprise]," and "provide by contract for assistance in fulfilling any function . . . of the [conservator]."  Id.  The conservator "may" also "take such action as may be . . . necessary to put the [Enterprise] in a sound and solvent condition; . . . and appropriate to carry on the business of the [Enterprise] and preserve and conserve the assets and property of the [Enterprise]."  Id. § 4617(b)(2)(D).  Rounding out the panoply of powers, Congress also provided that the conservator "may . . . exercise . . . such incidental powers as shall be necessary to carry out [its enumerated powers]" and "take any action authorized by [12 U.S.C. § 4617(b)], which [it] determines is in the best interest of the [Enterprise] or the [FHFA]."  Id. § 4617(b)(2)(J).  By describing the FHFA-C's role primarily in terms of what powers it "may" exercise, see generally id. § 4617, Congress provided the FHFA-C with significant discretion on when or how it uses its powers, see United States v. Rodgers, 461 U.S. 677, 706 (1983) ("The word 'may,' when used in a statute, usually implies some degree of discretion.").  Simply stated, the FHFA has "extraordinarily broad flexibility to carry out its role as conservator."  Perry Capital LLC v. Mnuchin, 864 F.3d 591, 606 (D.C. Cir. 2017) ("Perry II"), cert. denied, 138 S. Ct. 978 (2018).

### 3. Congress authorized Treasury to purchase securities issued by the Enterprises.

At the same time that it established the FHFA, Congress authorized the Treasury Secretary to buy securities issued by the Enterprises in limited circumstances.  12 U.S.C. §§ 1455(*l*) (Freddie), 1719(g) (Fannie).  Congress included a sunset clause on this power; the Secretary could not purchase securities after December 31, 2009.  Id. §§ 1455(*l*)(4), 1719(g)(4).  Until that date, the Secretary was permitted to purchase the securities if he determined that doing so was necessary to provide stability to the financial markets, prevent disruptions in the

---

[3]  To avoid any ambiguity, the court reiterates that it is using "FHFA" to refer to the agency acting in its regulatory role and "FHFA-C" when discussing the agency acting as a conservator.

[4]  Congress enticed the Enterprises to consent to a conservatorship by insulating their board members from any liability to shareholders or creditors for agreeing in good faith to the FHFA's appointment of a conservator.  12 U.S.C. § 4617(a)(6).

availability of mortgage finance, and protect taxpayers.  Id. §§ 1455(*l*)(1)(B), 1719(g)(1)(B).  As part of his obligation to protect taxpayers, the Secretary could only purchase securities after considering:

> (i)  The need for preferences or priorities regarding payments to the Government.

> (ii)  Limits on maturity or disposition of obligations or securities to be purchased.

> (iii)  The [Enterprise's] plan for the orderly resumption of private market funding or capital market access.

> (iv)  The probability of the [Enterprise] fulfilling the terms of any such obligation or other security, including repayment.

> (v)  The need to maintain the [Enterprise's] status as a private shareholder-owned company.

> (vi)  Restrictions on the use of [Enterprise] resources, including limitations on the payment of dividends and executive compensation and any such other terms and conditions as appropriate for those purposes.

Id. §§ 1455(*l*)(1)(C), 1719(g)(1)(C).

### 4.  The FHFA became the conservator for each Enterprise.

After Congress enacted HERA, Treasury "urg[ed]" the FHFA to place each Enterprise into conservatorship.  2d Am. Compl. ¶ 4.  The FHFA and Treasury subsequently sought to persuade each Enterprise's board of directors to consent to conservatorship.  Id. ¶ 45.  The FHFA and Treasury told each Enterprise's board that the FHFA would seize the Enterprises if the board did not consent to the conservatorship.  Id.  Around the same time, the FHFA made an offer to each board:  consent to a conservatorship in exchange for the FHFA-C aiming to preserve and conserve the Enterprises' assets, attempting to restore the Enterprises to sound and solvent condition, and terminating the conservatorships when those goals were achieved.  Id. ¶¶ 45-48.  Each Enterprise's board accepted that offer and consented to a conservatorship on September 6, 2008, with an understanding that the FHFA-C would operate in the aforementioned limited ways.  Id. ¶ 45.  The FHFA, soon thereafter, issued statements echoing each board's understanding.  Id. ¶¶ 46-47.

The conservatorships became effective on September 6, 2008, upon each Enterprise's board's consent.  Id. ¶ 45; see also 12 U.S.C. § 4617(a)(3)(I) (permitting the FHFA Director to appoint a conservator when "[t]he [Enterprise], by resolution of its board of directors or its shareholders or members, consents to the appointment").

**5.  The FHFA-C contracted with Treasury to obtain funding for the Enterprises.**

On September 7, 2008, the FHFA-C entered into a Preferred Stock Purchase Agreement ("PSPA") with Treasury for each Enterprise.  2d Am. Compl. ¶ 49.  Treasury entered into the agreements pursuant to its authority under HERA to buy the Enterprises' securities.  Id. ¶ 50.  The PSPA for each Enterprise is materially identical.  Id. ¶ 53.  Under the PSPAs, Treasury committed to provide up to $100 billion to each Enterprise to ensure that the Enterprises maintained a positive net worth.  Id.  If an Enterprise's liabilities exceeded its assets, then the Enterprise could draw on Treasury's funding commitment in an amount equal to the difference between the Enterprise's liabilities and assets.  Id.

In return for Treasury's funding commitment, the Enterprises surrendered stock, dividends, commitment fees, and control.  First, with respect to the stock, Treasury acquired one-million shares of preferred stock in each Enterprise and warrants to purchase 79.9% of their respective common stock at a nominal price.  Id. ¶ 54.  Treasury's preferred stock had an initial liquidation preference of $1 billion, but the amount increased dollar-for-dollar when an Enterprise drew on Treasury's funding commitment.  Id. ¶ 55.  In the event of a liquidation, Treasury was entitled to recover the full liquidation value of its shares before any other shareholder would receive compensation.  Id.  Second, Treasury bargained for the right to a quarterly cash dividend equal to 10% of its liquidation preference.  Id. ¶¶ 57, 60.  An Enterprise that decided against paying a cash dividend in a specific quarter could make an in-kind payment: the value of the dividend would be added to the liquidation preference, and the dividend rate would increase to 12%.  Id. ¶ 57.  Those in-kind payments, however, did not count as a draw from Treasury's funding commitment.  Id. ¶ 61.  Third, Treasury received the right to a quarterly commitment fee from each Enterprise, but Treasury could waive the fee each year.  Id. ¶ 62.  If Treasury did not waive the fee, the Enterprise could elect to pay the amount in cash or make an in-kind payment by increasing the liquidation preference.  Id.  Fourth, Treasury obtained de facto control over various aspects of each Enterprise; the Enterprises needed to obtain Treasury's consent before awarding dividends, issuing stock, transferring assets, incurring certain types of debt, and making certain organizational changes.  Id. ¶ 63.

The FHFA-C and Treasury amended each Enterprise's PSPA on May 6, 2009, to increase Treasury's funding commitment to each Enterprise from $100 billion to $200 billion.  Id. ¶ 65.  On December 24, 2009, the FHFA-C and Treasury executed another amendment to the PSPAs; they abolished the specific dollar cap and replaced it with a formula to allow Treasury's total commitment to each Enterprise to exceed $200 billion.  Id.

**6.  The Enterprises' finances improved during their conservatorships.**

In the early stages of the conservatorships, each Enterprise's net worth decreased as it reported losses.  The bulk of the losses resulted from the FHFA-C writing down the value of deferred tax assets and designating large loan loss reserves.[5]  Id. ¶ 66.  Notwithstanding those

---

[5]  A loan loss reserve is an entry on a company's balance sheet that reduces its net worth to reflect anticipated losses on mortgages that it owns.  2d Am. Compl. ¶ 68.  A deferred tax asset is an asset that may be used to offset future tax liability.  Id. ¶ 67.  A company must write

on-paper losses, the Enterprises' cash receipts consistently exceeded their expenses; they maintained net operating revenue in excess of their net operating expenses from the onset of the conservatorships under the PSPAs and through the first two amendments to the agreements.  Id. ¶ 72.

By 2012, the Enterprises' financial outlooks were promising.  In addition to an improvement in the housing market, the Enterprises began generating consistent profits and anticipated losing less money on their newer mortgages.  Id. ¶¶ 73-76.  They were positioned to further improve their financial condition by settling lawsuits brought by each Enterprise, id. ¶ 89, and revising their valuations of (1) deferred tax assets because of growing profits and (2) loan loss reserves because losses were less than expected, id. ¶¶ 79-80.  The FHFA-C and Treasury were aware of those forthcoming changes and the Enterprises' improving outlooks.  Id. ¶¶ 75-80.  In August 2012, Treasury and FHFA-C knew that the Enterprises would soon experience improved profitability and received projections reflecting that the Enterprises would have positive comprehensive income between 2012 and 2022.  Id. ¶¶ 81-84.  Otherwise stated, the FHFA-C and Treasury knew, by early August 2012, that the Enterprises were poised to generate profits in excess of their respective dividend obligations to Treasury.  Id. ¶ 88.

### 7.  Treasury and the FHFA-C agreed to a third amendment to the PSPAs.

At an unspecified time prior to August 2012, the Treasury and the FHFA-C began considering a third amendment to each PSPA.  Treasury was the driving force behind the initiative to amend the PSPAs' terms.  Id. ¶ 127.  Indeed, an FHFA official reported in early August 2012 that Treasury was making a "renewed push" to implement a new amendment.  Id. ¶ 126 (quoting the FHFA official).  The FHFA-C learned of the proposed changes before the Enterprises; Treasury informed the Enterprises that the new terms were forthcoming and announced the changes to the Enterprises at a subsequent meeting.  Id. ¶ 127.  Treasury officials who were involved with the process do not recall Treasury making any backup or contingency plans in the event that the FHFA-C rejected the proposed terms.  Id.  The FHFA-C accepted the changes without advocating for different terms.  Fairholme II, 147 Fed. Cl. at 19.

Treasury and the FHFA-C decided to announce the changed terms in mid-August 2012 because, according to Treasury, the Enterprises would be reporting earnings exceeding their dividend obligation at the beginning of that month.  2d Am. Compl. ¶ 110.  On August 17, 2012, Treasury and the FHFA-C executed the third amendment to each PSPA ("PSPA Amendment").  Id. ¶ 92.  A key component of the amended PSPAs is the requirement—referred to as the "Net Worth Sweep"—that each Enterprise pay Treasury a quarterly dividend equal to 100% of each Enterprise's net worth (except for a small capital reserve amount) rather than a dividend based

---

down the value of that deferred asset if it is unlikely to be used to offset future taxable profits.  Id.  This write down occurs, for example, if a company predicts it will not be profitable in the future.  Id.

on a set percentage of the liquidation preference.[6]  Id. ¶ 93.  Additionally, under the amended PSPAs, the Enterprises are not obligated to pay a periodic commitment fee.  Id. ¶ 95.

### a. Treasury wanted to ensure that it benefited from the new terms.

With the PSPAs, Treasury sought to secure a more beneficial arrangement for itself, as a representative for taxpayers.  During the lead-up to the PSPA Amendments, a Treasury official acknowledged in an internal communication that the government had resolved "to ensure existing common equity holders will not have access to any positive earnings from the [Enterprises] in the future."  Id. ¶ 9 (quoting the document).  In another Treasury document, an official noted that the amended PSPAs would put the taxpayer "in a better position" because, rather than having "Treasury's upside . . . capped at the 10% dividend, now the taxpayer will be the beneficiary of any future earnings produced by the [Enterprises]."  Id. ¶ 110 (quoting the document).  Treasury recognized its goal of obtaining all of the Enterprises' profits by executing the PSPA Amendments; when the changes were announced, it noted that "every dollar of earnings that [the Enterprises] generate will be used to benefit taxpayers."  Id. ¶ 98 (quoting a Treasury press release).

### b. The FHFA-C agreed to changes that benefit Treasury.

For its part, the FHFA-C was operating under the belief that Treasury would benefit from the PSPA Amendments.  An internal Treasury communication indicates that Treasury anticipated that its receipts under the PSPA Amendments would "'exceed the amount that would have been paid if the 10% [dividend] was still in effect' and that the changes would lead to 'a better outcome' for Treasury."  Id. ¶ 110 (quoting the communication).  Moreover, Mel Watt—a former FHFA Director—confirmed that he was concerned with how decisions affect the taxpayers.  Id. ¶ 99.  During an interview conducted while he was Director, he stated that he does not "'lay awake at night worrying what's fair to the shareholders' but rather focuses on 'what is responsible for the taxpayers.'"  Id. (quoting the interview).

### c. Treasury and the FHFA understood that the PSPA Amendments would not facilitate the Enterprises exiting conservatorship.

Treasury was aware that the new terms of the PSPAs were not conducive to the Enterprises exiting conservatorship.  When announcing the PSPA Amendments, Treasury openly acknowledged that the new terms would "expedite the wind down of [the Enterprises]."  Id. ¶ 114 (quoting a Treasury press release).  Treasury further explained that the new deal would ensure that the Enterprises "will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form."  Id.; accord id. ¶ 14 (explaining that "[b]y taking all of their profits going forward, [Treasury is] making clear that [the Enterprises] will not ever be allowed to return to profitable entities") (quoting internal Treasury document).  Indeed, a White House official sent a message to a Treasury official on the day the deal was announced

---

[6]  The capital reserve for each Enterprise started at $3 billion and was set to decrease to $0 by January 2018, but the Enterprises and Treasury agreed in December 2017 to reset the capital reserve amount to $3 billion in the first quarter of 2018.  2d Am. Compl. ¶ 104.

noting that "we've closed off [the] possibility that [the Enterprises] ever[] go (pretend) private again." Id. ¶ 118 (alterations in original) (quoting the message); accord id. (noting in a separate message that a quotation "in Bloomberg" was "exactly right on substance and intent" when describing the deal as depriving the Enterprises of the capital they needed to go private).

The FHFA shared a similar sentiment. The FHFA's former Acting Director, Edward DeMarco, testified before the United States Senate that the PSPA Amendments "reinforce the notion that the [Enterprises] will not be building capital as a potential step to regaining their former corporate status." Id. ¶ 115 (quoting the testimony). He also stated that he had no intention of returning the Enterprises to private control under their existing charters, while another FHFA official testified that the agency's objective "was not for Fannie and Freddie . . . to emerge from conservatorship." Id. ¶ 116 (quoting the testimony). Indeed, the FHFA explained in its 2012 report to Congress that the agency had begun "prioritizing [its] actions to move the housing industry to a new state, one without Fannie . . . and Freddie . . . ." Id. ¶ 115 (quoting the report). Consistent with those actions, the FHFA acknowledged that it would continue to serve as conservator until "Congress determines the future of [the Enterprises] and the housing finance market." Id. ¶ 116 (quoting an FHFA statement).

### d. Treasury has benefited from the PSPA Amendments at the expense of the Enterprises and other shareholders.

There are four significant effects that flowed from the PSPA Amendments. First, plaintiffs lost their economic interests in the Enterprises because, under the new terms, private shareholders can never receive dividends or liquidation distributions. Id. ¶ 97; see also id. (alleging that, in the event of liquidation, private shareholders will receive nothing because an Enterprise will never have enough money to pay Treasury's dividend and liquidation preferences). Second, Treasury acquired plaintiffs' economic interests in the Enterprises because Treasury now "has the right to all residual profits, and it hence owns all the equity." Id. ¶ 100. Third, Treasury reaped a windfall of $124 billion in comparison to what it would have received absent changes to the PSPAs. Id. ¶ 15; see id. ¶¶ 102-03 (alleging that the Enterprises paid Treasury $223.7 billion under the PSPA Amendments but would have only paid Treasury $99.5 billion under the previous terms). Fourth, the Enterprises can never be rehabilitated to a sound and solvent condition because, by transferring their profits to Treasury, they will perpetually operate on the brink of insolvency. Id. ¶¶ 111-12.

### 8. Treasury and the FHFA are committed to ending the conservatorships.

On March 27, 2019, President Donald J. Trump issued a memorandum in which he directed the Treasury Secretary to develop, "as soon as practicable," a plan for "[e]nding the conservatorships of the [Enterprises] upon the completion of specified reforms . . . ."[7]

---

[7] The court takes judicial notice of the presidential memorandum because it is a government record published in a reliable source, the Federal Register. See Murakami v. United States, 46 Fed. Cl. 731, 739 (2000) (noting that the court may take judicial notice of government documents), aff'd, 398 F.3d 1342, 1354-55 (Fed. Cir. 2005); see also Democracy Forward Found. v. White House Office of Am. Innovation, 356 F. Supp. 3d 61, 62 n.2 (D.D.C. 2019)

Memorandum on Federal Housing Finance Reform, 84 Fed. Reg. 12,479, 12,479 (Mar. 27, 2019).  The President explained that the plan must include proposals for "[s]etting the conditions necessary for the termination of the conservatorships" and outlined some of those conditions.  Id. at 12,480.  Subsequently, Treasury issued a plan in which it advocated for "begin[ning] the process of ending the [Enterprises'] conservatorships."[8]  U.S. Dep't of the Treasury, Housing Reform Plan Pursuant to the Presidential Memorandum Issued March 27, 2019, at 3 (2019), https://home.treasury.gov/system/files/136/Treasury-Housing-Finance-Reform-Plan.pdf [https://perma.cc/RGH8-N385]; accord id. at 26 ("It is, after 11 years, time to bring the conservatorships to an end.").  As part of the plan to end the conservatorships, Treasury proposed that it and the FHFA consider revising the Net Worth Sweep to allow the Enterprises to retain more of their earnings.  Id. at 26-27.

The FHFA shares Treasury's goals with respect to the conservatorships.  Mark Calabria, the current FHFA Director, testified during his confirmation hearing that he wanted to end the conservatorships.[9]  165 Cong. Rec. S2246 (daily ed. Apr. 4, 2019) (statement of Sen. Crapo) (summarizing testimony).  See generally Nominations of Bimal Patel, Todd M. Harper, Rodney Hood, and Mark Anthony Calabria:  Hearing Before the S. Comm. on Banking, Hous., and Urban Affairs, 116th Cong. 10-40, 74-75, 148-85 (2019) [hereinafter Calabria Testimony] (documenting Mr. Calabria's testimony, statement, and responses to written questions during and after his confirmation hearing).  He also stated that, as FHFA Director, he would seek to increase the amount of capital that each Enterprise retains.  Calabria Testimony, supra, at 150; see also id. at 25 ("I support the idea of having significantly more capital at the [Enterprises].").

### B.  Plaintiffs own Fannie and Freddie stock.

There are three plaintiffs in this case; each plaintiff is an insurance company related to the others through subsidiary relationships.  The first is Arrowood Indemnity Company ("Arrowood Indemnity"), a Delaware corporation.  2d Am. Compl. ¶ 19.  Arrowood Indemnity owns Fannie preferred stock and Freddie preferred stock.  Id. ¶¶ 19-20.  The second company is Arrowood Surplus Lines Insurance Company ("Arrowood Surplus Lines"), also a Delaware corporation.  Id. ¶ 21.  Arrowood Surplus Lines owns Fannie preferred stock and Freddie preferred stock.  Id. ¶¶ 21-22.  The third company is Financial Structures Limited, a Bermuda

---

("[J]udicial notice may be taken of government documents available from reliable sources, such as this 2017 Presidential Memorandum."); see generally Fed. R. Evid. 201 (discussing judicial notice).  Although a motion to dismiss is normally limited to the allegations in a complaint, the court may consider facts derived from sources subject to judicial notice without converting the motion into one for summary judgment.  Sebastian v. United States, 185 F.3d 1368, 1374 (Fed. Cir. 1999).

[8]  The court takes judicial notice of Treasury's reform plan because it is a government record available from a reliable source, Treasury's website.  See supra note 7.

[9]  The court takes judicial notice of the relevant testimony because the statements are recorded in government documents.  See supra note 7.

company that owns Freddie preferred stock.  Id. ¶ 23.  Each plaintiff has owned shares in the Enterprises since before September 6, 2008.  Id. ¶¶ 19-23.

## II. PROCEDURAL HISTORY

Plaintiffs filed their complaint on September 18, 2013.[10]  After jurisdictional discovery proceeded in Fairholme, a related case, see supra note 1, plaintiffs filed their second amended complaint in this case on September 17, 2018.  In their second amended complaint, plaintiffs present four claims.  Plaintiffs first assert that the Net Worth Sweep constitutes a Fifth Amendment taking (count I) of their economic interests in their stock.  Plaintiffs next assert that the Net Worth Sweep constitutes an illegal exaction (count II) of those same economic interests because the (1) FHFA was operating unconstitutionally and (2) FHFA-C and Treasury exceeded their statutory authority when they approved the PSPA Amendments.  Plaintiffs also plead a breach-of-fiduciary-duty claim ("fiduciary duty claim") (count III) premised on the Net Worth Sweep being unfair; constituting waste, self dealing, gross overreach, and gross abuse of discretion; and failing to further a valid business purpose or reflect a good faith business judgment.  Additionally, plaintiffs assert a breach-of-implied-contract claim (count IV) based on a purported agreement by which the Enterprises consented to the conservatorship in exchange for the FHFA agreeing to preserve the Enterprises' assets with the goal of making them safe and solvent.  Specifically, plaintiffs assert that each dividend payment under the Net Worth Sweep constitutes a breach because it depletes the Enterprises' assets in a manner that undermines the goals of conservatorship.

On October 1, 2018, defendant moved to dismiss—in a single, omnibus motion—the claims in this case and eleven related cases before the undersigned.[11]  The plaintiffs in each of the twelve cases filed a response brief on their respective dockets; some of the plaintiffs relied on a joint brief, while others, as is the case here, filed a joint brief and a supplemental response brief.  Defendant filed its omnibus reply brief in each of the cases on May 6, 2019.  The parties have fully briefed defendant's motion, and the court held a single oral argument on November 19, 2019, involving the plaintiffs from each of the twelve cases that defendant moved to dismiss. The plaintiffs in those cases collaborated during argument; each plaintiff argued some of the issues.  Thus, the court infers that the plaintiffs in this case have adopted the favorable arguments

---

[10]  A fuller recitation of the procedural history of this case and related cases is provided in Fairholme II, 147 Fed. Cl. at 21-23.

[11]  The eleven related cases are Fairholme Funds, Inc. v. United States, No. 13-465C; Washington Federal v. United States, No. 13-385C; Cacciapalle v. United States, No. 13-466C; Fisher v. United States, No. 13-608C; Reid v. United States, No. 14-152C; Rafter v. United States, No. 14-740C; Owl Creek Asia I, L.P. v. United States, No. 18-281C; Akanthos Opportunity Master Fund, L.P. v. United States, No. 18-369C; Appaloosa Investment Limited Partnership I v. United States, No. 18-370C; CSS, LLC v. United States, No. 18-371C; and Mason Capital L.P. v. United States, No. 18-529C.

made by the plaintiffs in the related cases to the extent that such arguments are relevant.[12] Defendant's motion to dismiss is now ripe for adjudication.

## III.  STANDARD OF REVIEW

In ruling on a motion to dismiss a complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), the court generally assumes that the allegations in the complaint are true and construes those allegations in the plaintiff's favor.  Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011).  With respect to RCFC 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of the evidence, that the court possesses subject-matter jurisdiction.  Id.  The allegations in the complaint must include "the facts essential to show jurisdiction."  McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936).  And, if such jurisdictional facts are challenged in a motion to dismiss, the plaintiff "must support them by competent proof."  Id.; accord Land v. Dollar, 330 U.S. 731, 735 & n.4 (1947) ("[W]hen a question of the District Court's jurisdiction is raised, . . . the court may inquire by affidavits or otherwise, into the facts as they exist." (citations omitted)).  If the court finds that it lacks subject-matter jurisdiction, it must, pursuant to RCFC 12(h)(3), dismiss the complaint.

A claim that survives a jurisdictional challenge remains subject to dismissal under RCFC 12(b)(6) if it does not provide a basis for the court to grant relief.  Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002) ("A motion to dismiss . . . for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy.").  To survive a motion to dismiss under RCFC 12(b)(6), a plaintiff must include in the complaint "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Indeed, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 814-19 (1982).

## IV.  SUBJECT-MATTER JURISDICTION

The court begins with jurisdiction because it is a "threshold matter."  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998).  Subject-matter jurisdiction cannot be waived or forfeited because it "involves a court's power to hear a case."  Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)).  "Without

---

[12]  Plaintiffs have specifically adopted certain arguments that support their breach-of-implied-contract claim that were made in a brief filed by the plaintiffs in Owl Creek.  Pls.' Supp'l Br. in Opp'n to Def.'s Omnibus Mot. to Dismiss 12-13.  More generally, they adopt any arguments presented in the supplemental briefing in other cases that support their claims.  Id. at 13.  However, given that the plaintiffs in this case allege direct claims, the court does not infer that they adopted the Reid and Fisher plaintiffs' argument that "the shareholder claims asserted in connection with the [PSPA Amendments] are properly asserted as derivative claims."  Reid Supp'l Mem. in Opp'n to Def.'s Omnibus Mot. to Dismiss 2; accord Fisher Supp'l Mem. in Opp'n to Def.'s Omnibus Mot. to Dismiss 2.

jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Ex parte McCardle, 74 U.S. (7 Wall) 506, 514 (1868). Therefore, it is "an inflexible matter that must be considered before proceeding to evaluate the merits of a case." Matthews v. United States, 72 Fed. Cl. 274, 278 (2006); accord K-Con Bldg. Sys., Inc. v. United States, 778 F.3d 1000, 1004-05 (Fed. Cir. 2015). Either party, or the court sua sponte, may challenge the court's subject-matter jurisdiction at any time. Arbaugh, 546 U.S. at 506; see also Jeun v. United States, 128 Fed. Cl. 203, 209-10 (2016) (collecting cases).

The ability of the United States Court of Federal Claims ("Court of Federal Claims") to entertain suits against the United States is limited. "The United States, as sovereign, is immune from suit save as it consents to be sued." United States v. Sherwood, 312 U.S. 584, 586 (1941). The waiver of immunity "may not be inferred, but must be unequivocally expressed." United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003). Any such waiver must be narrowly construed. Smith v. Orr, 855 F.2d 1544, 1552 (Fed. Cir. 1988). The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United States, not sounding in tort, that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491(a)(1) (2018); White Mountain, 537 U.S. at 472. However, the Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." United States v. Testan, 424 U.S. 392, 298 (1976). Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc).

Defendant challenges the court's jurisdiction to entertain plaintiffs' claims on a number of bases. Specifically, defendant argues that 28 U.S.C. § 1500 bars plaintiffs' claims, that plaintiffs have not asserted claims against the United States, and that the court lacks jurisdiction over the subject matter of certain claims. The court addresses each of these contentions in turn.[13]

## A. Plaintiffs are not barred by 28 U.S.C. § 1500 from litigating their claims in this court.

The court first addresses defendant's argument that the court lacks jurisdiction to consider plaintiffs' claims because plaintiffs initiated lawsuits in other courts after filing their complaint in this court. Specifically, defendant asserts that the claims are barred by 28 U.S.C. § 1500, which provides:

> The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person who, at the time

---

[13] In Fairholme II, the court addressed an additional jurisdictional concern that was not raised in this case. See generally 147 Fed. Cl. at 34-37 (rejecting the contention of a putative intervenor that the Court of Federal Claims lacks jurisdiction to entertain Fifth Amendment takings claims).

when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States.

Defendant acknowledges that, under binding precedent, § 1500 is not a bar in this case because the limitation only applies "when the suit shall have been commenced in the other court before the claim was filed in [the Court of Federal Claims]." Tecon Eng'rs, Inc. v. United States, 343 F.2d 943, 949 (Ct. Cl. 1965). Nonetheless, defendant asserts that the court should reinterpret § 1500 as creating a jurisdictional bar regardless of the timing of the filings. Plaintiffs counter that the court cannot disregard the binding precedent.

As defendant acknowledges, its argument is foreclosed by binding precedent: The jurisdictional limitation in § 1500 does not apply in this case because plaintiffs filed their complaint in this court before seeking redress in other jurisdictions. See Tecon, 343 F.2d at 949; see also Res. Invs., Inc. v. United States, 785 F.3d 660, 670 (Fed. Cir. 2015) (noting that Tecon remains good law in this circuit). Compare Compl. (filed Sept. 18, 2013), with Compl., Arrowood Indemnity Co. v. Fed. Nat'l Mortg. Ass'n, No. 13-1439 (D.D.C. Sept. 20, 2013). Although defendant urges the court to reconsider the rule set forth in Tecon, the court cannot do so because it is bound by that precedent. See Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1353 (Fed. Cir. 2006) ("There can be no question that the Court of Federal Claims is required to follow the precedent of . . . our court, and our predecessor court, the Court of Claims."). Plaintiffs' claims, therefore, are not barred by § 1500.

### B. Plaintiffs have asserted claims against the United States.

The court next considers whether plaintiffs have asserted claims against the United States, a necessary element of jurisdiction in the Court of Federal Claims. As set forth in their second amended complaint, plaintiffs' Fifth Amendment takings, illegal exaction, and breach-of-implied-contract claims are premised on actions taken by the FHFA-C and Treasury, while plaintiffs' fiduciary duty claim is premised on the FHFA-C's actions. Defendant argues that the court lacks jurisdiction to consider any claims premised on the FHFA-C's or Treasury's conduct. In response, plaintiffs contend that they have asserted claims against the government because (1) Treasury was involved in the challenged conduct, (2) the FHFA-C exercised nontraditional conservator powers such that its actions must be deemed those of the government, (3) the FHFA-C was coerced by the government, (4) the FHFA-C was the government's agent, and (5) the FHFA-C is a government actor. The court addresses each contention in turn.

### 1. The court cannot exercise jurisdiction based on allegations of Treasury's involvement.

Plaintiffs initially argue that the court has jurisdiction over their Fifth Amendment takings and illegal-exaction claims because they have alleged the involvement of Treasury—indisputably a part of the federal government—in the action underlying these claims, i.e., the Net Worth Sweep. Defendant counters that Treasury alone could not have implemented the PSPA Amendments, and Treasury's role as a counterparty to the voluntary agreement with the Enterprises is not sufficient to establish jurisdiction over plaintiffs' takings claim. Defendant

further asserts that the court's order allowing jurisdictional discovery reflects that plaintiffs' allegations concerning Treasury alone are insufficient to confer jurisdiction.

The parties' dispute on the import of allegations concerning Treasury is ultimately immaterial in light of the court's determination, explained below, that the FHFA-C—the other party involved in the PSPA Amendments—is the United States. Nonetheless, the court notes, as defendant asserts, that it implicitly acknowledged in its February 26, 2014 discovery order that the allegations concerning Treasury alone were insufficient to support jurisdiction. In that order, the court permitted plaintiffs to conduct fact discovery on whether the FHFA-C was "the 'United States' for purposes of the Tucker Act." Fairholme Funds, Inc. v. United States, 114 Fed. Cl. 718, 721 (2014). The aforementioned discovery would have been unnecessary (and unwarranted) if, as plaintiffs assert, the court has jurisdiction over plaintiffs' claims based on their allegations concerning Treasury.

**2. The FHFA-C exercised its statutory conservatorship powers when it approved the PSPA Amendments for each Enterprise.**

Plaintiffs next argue that the FHFA-C must be considered the United States because the FHFA-C acted beyond its authority when it expropriated the Enterprises' assets for the government's benefit. Defendant counters that, irrespective of the "expropriation" label assigned by plaintiffs, the FHFA-C's execution of the PSPA Amendments was consistent with its statutory authority and purpose.

The FHFA-C is the United States for any claims challenging the conservator's conduct that exceeded the applicable statutory authority. Cf. Slattery v. United States, 583 F.3d 800, 827-28 (Fed. Cir. 2009) (noting that the Federal Deposit Insurance Company ("FDIC") as receiver is the United States for claims premised on allegations that the receiver failed to distribute funds as required by statute). Thus, resolving the parties' dispute requires determining whether the FHFA-C had statutory authority to enter into the PSPA Amendments. The answer depends on HERA. Under HERA, the FHFA-C has exceptionally broad powers. See Jacobs v. Fed. Hous. Fin. Agency, 908 F.3d 884, 889 (3d Cir. 2018) (noting that the FHFA-C's "powers are many and mostly discretionary"); see also Saxton v. Fed. Hous. Fin. Agency, 901 F.3d 954, 960 (8th Cir. 2018) (Stras, J., concurring) ("Congress came close to handing a blank check to the FHFA."). The FHFA-C wields complete control over the Enterprises; it succeeds to the rights and powers of the Enterprises as well as their shareholders, directors, and officers. 12 U.S.C. § 4617(b)(2)(A)(i). The FHFA-C may (but is not required to) use that power to, among other things, further the FHFA's interests, carry on the Enterprises' business, preserve and conserve the Enterprises' assets, and place the Enterprises in sound and solvent condition.[14] Id.

---

[14] The conclusion that the FHFA-C has some discretionary powers is buttressed by the fact that Congress stated the conservator "may" do certain things but "shall" do others. See Huston v. United States, 956 F.2d 259, 262 (Fed. Cir. 1992) ("When, within the same statute, Congress uses both 'shall' and 'may,' it is differentiating between mandatory and discretionary tasks."). Compare 12 U.S.C. § 4617(b)(2)(D) ("The [FHFA] may, as conservator, take such action as may be . . . necessary to put the regulated entity in sound and solvent condition . . . ." (emphasis added)), with id. § 4617(b)(14)(A) ("The [FHFA] as conservator or receiver shall

§ 4617(b)(2)(B), (D), (J) (noting actions that the FHFA-C "may" undertake); see also Roberts v. Fed. Hous. Fin. Agency, 889 F.3d 397, 403 (7th Cir. 2018) (explaining that Congress's use of "may" reflects that the FHFA-C has discretionary authority).

Congress's broad grant of power to the FHFA-C colors the analysis of whether the FHFA-C became the United States by approving the PSPA Amendments.  As an initial matter, plaintiffs' contention that the FHFA-C exceeded its statutory authority by expropriating the Enterprises' assets for the government is unavailing because the FHFA-C is authorized to act in its own interest without regard for the effects on the Enterprises.  Moreover, the FHFA-C's approval of the PSPA Amendments is in accordance with its authority to operate the Enterprises and preserve their assets.  As operating businesses, the Enterprises needed to "secure ongoing access to capital, manage debt loads, control cash flow, and decide whether and how to pay dividends." Jacobs, 908 F.3d at 890.  The FHFA-C achieved those goals with the PSPA Amendments, which are, "in essence[,] a renegotiation of an existing lending agreement."  Id. By agreeing to the PSPA Amendments, the FHFA-C eliminated the risk of the Enterprises consuming all of their financial lifeline (Treasury's funding commitment) through cash-dividend payments or entering a cycle of an ever-increasing liquidation preference.[15]  Roberts, 889 F.3d at 404-05; see also Jacobs, 908 F.3d at 890 (noting that the Enterprises increased their future obligations and reduced their available funds by drawing funds from Treasury to pay the dividend); Saxton, 901 F.3d at 962 (Callas, J., concurring) ("Crushing dividend payments could have led the entities toward insolvency.").  The FHFA-C, with the amendments, also protected the Enterprises against future financial downturns.[16]  See Jacobs, 908 F.3d at 890 ("The [PSPA Amendments] insured the [Enterprises] against downturns and 'death spirals,' preventing unpayable dividends from ratcheting up their debt loads to unsustainable levels."); see also Roberts, 889 F.3d at 405 (noting that the Enterprises fared better in some years and worse in other years under the terms of the PSPA Amendments as compared to the previous agreements).

In light of the above, the FHFA-C's execution of the PSPA Amendment for each Enterprise was a "quintessential conservatorship task[]" that is appropriate under HERA.  Perry II, 864 F.3d at 607.  Although "stockholders no doubt disagree about the necessity and fiscal

---

. . . maintain a full accounting of each conservatorship and receivership or other disposition of a[n Enterprise] in default." (emphasis added)).

[15]  If, under the terms of the PSPAs before the PSPA Amendments, the Enterprises chose to make their dividend payment by increasing Treasury's liquidation preference, the future dividends would be more expensive because the dividends were a set percentage of the liquidation preference.  Making future dividends more expensive would, in turn, increase the likelihood that the Enterprises would again need to rely on increasing Treasury's liquidation preference rather than making a cash payment.  The end result is a cycle in which the Enterprises continue to increase Treasury's liquidation preference.

[16]  Although the FHFA-C anticipated continued profitability for the Enterprises in the near term, this fact does not undermine the propriety of the PSPA Amendments because ensuring the continued functioning of a company includes guarding against long-term risks.  These long-term outlooks are especially important given the indefinite nature of the FHFA-C's role.

wisdom of the [PSPA Amendments] . . . , Congress could not have been clearer about leaving those hard operational calls to the FHFA's managerial judgment." Id.  In sum, the court joins the growing consensus that the FHFA-C acted within its statutory authority when it entered into the PSPA Amendments.  See Jacobs, 908 F.3d at 894; Saxton, 901 F.3d at 963; Roberts, 889 F.3d at 403; Robinson v. Fed. Hous. Fin. Agency, 876 F.3d 220, 231 (6th Cir. 2017); Perry II, 864 F.3d at 606.  But see Collins v. Mnuchin, 938 F.3d 553, 582 (5th Cir. 2019) (en banc) (holding, over the dissent of seven judges, that the plaintiffs stated a plausible claim that the FHFA-C exceeded its statutory authority), petitions for cert. filed, 88 U.S.L.W. 3114 (U.S. Sept. 25, 2019) (No. 19-422), 88 U.S.L.W. 3146 (U.S. Oct. 25, 2019) (No. 19-563).  Thus, plaintiffs' theory that the FHFA-C is the United States because the FHFA-C exceeded its statutory authority is not persuasive.

### 3. The FHFA-C was not coerced into approving the PSPA Amendments.

Plaintiffs also argue that the FHFA-C is the United States because the FHFA-C was coerced into approving the PSPA Amendments by Treasury.  Plaintiffs assert that Treasury coerced the FHFA-C into approving the PSPA Amendments because (1) Treasury drove the amendment process, (2) Treasury did not plan for the possibility that the FHFA-C would reject the amendments, and (3) the FHFA-C did not propose any alternatives to the amendments.  In the alternative, plaintiffs contend that the FHFA, in its role as regulator, coerced the FHFA-C to approve the amendments because the two entities were not acting independently.  Specifically, plaintiffs aver that the lines between the FHFA and the FHFA-C were blurred because (1) the FHFA's consent was required for any dividend payment and (2) the FHFA-C approved the amendments to achieve governmental objectives.

Defendant counters that the FHFA-C was not coerced by Treasury because the FHFA-C had a choice of whether to accept or reject the PSPA Amendments.  Defendant asserts that there is no coercion if a party has a choice, regardless of however difficult refusal of a particular option may be.  With respect to Treasury's involvement, defendant contends that plaintiffs fail to proffer any allegations that Treasury required the FHFA-C to enter into the agreements against its will.  Defendant further asserts that other courts have declined to conclude that the FHFA-C felt compelled to follow Treasury based on allegations that Treasury invented the amendment concept or led the process.  Defendant also argues that the FHFA-C was not coerced by the FHFA in the latter's role as regulator because there were clear statutory lines delineating the FHFA's authority in each role.[17]

### a. The court has jurisdiction over claims based on actions that resulted from government coercion.

The court has jurisdiction over claims premised on the FHFA-C's actions if Treasury's "influence over the" FHFA-C "was coercive rather than merely persuasive."  A & D Auto Sales, Inc. v. United States, 748 F.3d 1142, 1154 (Fed. Cir. 2014).  The line between coercion and

---

[17] Defendant frames its argument as addressing whether the FHFA-C acted as an agent for the FHFA in its role as regulator, but defendant is responding to plaintiffs' coercion argument.

persuasion "is highly fact-specific." Id. Precedent from the United States Court of Appeals for the Federal Circuit ("Federal Circuit") frames the contours of the inquiry. In Langenegger v. United States, the plaintiffs pleaded that the United States coerced El Salvador by threatening to withhold financial and military assistance unless El Salvador passed legislation expropriating private property. 756 F.2d 1565, 1567 (Fed. Cir. 1985). The Federal Circuit disagreed with the plaintiffs' characterization of the threats because "[d]iplomatic persuasion among allies is a common occurrence, and as a matter of law, cannot be deemed sufficiently irresistible to warrant a finding of [coercion], however difficult refusal may be as a practical matter." Id. at 1572. Similarly, the Federal Circuit concluded in B & G Enterprises, Ltd. v. United States that California was not coerced into enacting restrictions on smoking, notwithstanding the federal government conditioning grants on states enacting such limits. 220 F.3d 1318, 1321, 1325 (Fed. Cir. 2000); see also A & D Auto, 748 F.3d at 1155 (explaining that "coercion was not established" in B & G). The court explained that "it was California's decision to create [the] restrictions[;] . . . Congress may have provided the bait, but California decided to bite." B & G, 220 F.3d at 1325. In A & D Auto, the Federal Circuit addressed coercion in the context of the government allegedly conditioning vital financial assistance to bankrupt automobile companies on those companies terminating some of their franchise agreements. 748 F.3d at 1145. Unable to resolve the issue due to gaps in the record, the court noted in dicta that a relevant consideration was "whether the government financing was essential to the companies." Id.

A common thread runs through the Federal Circuit's decisions: the importance of choice. A nonfederal actor is not coerced when it can choose to go against the wishes of the United States, even if doing so will cause significant hardships, Langenegger, 756 F.2d at 1567, or result in a loss of prospective benefits, id.; B & G, 220 F.3d at 1325. But there is no choice, in any meaningful sense, when there is only one realistic option. A & D Auto, 748 F.3d at 1145 (noting the importance of considering whether the companies could survive without accepting the government's offer); cf. Nevada v. Skinner, 884 F.2d 445, 448 (9th Cir. 1989) (noting that, with respect to Congress's spending powers, "the federal government may not, at least in certain circumstances, condition the receipt of funds in such a way as to leave the state with no practical alternative but to comply with federal restrictions"). Put differently, the nonfederal actor must make a voluntary decision, which it cannot do if there is only one realistic option. See BMR Gold Corp. v. United States, 41 Fed. Cl. 277, 282 (1998) (finding that the "the necessary element of coerciveness" for a taking was missing because the plaintiff granted the military permission to cross his land); accord Henn v. Nat'l Geographic Soc., 819 F.2d 824, 826 (7th Cir. 1987) (noting that hard choices remain voluntary when they are not akin to "Don Corelone's 'make him an offer he can't refuse'"). In sum, the FHFA-C was not coerced if it voluntarily chose to enter into the PSPA Amendments.

### b. Plaintiffs have not established that Treasury coerced the FHFA-C into approving the PSPA Amendments.

In support of their contention that Treasury coerced the FHFA-C into approving the PSPA Amendments, plaintiffs allege that Treasury proposed the terms of the amendments, and the FHFA-C did not make a counteroffer. Those allegations are not enough to establish coercion. First, given the Enterprises' improving financial condition and Treasury's existing funding commitment, the FHFA-C's decision to execute the PSPA Amendments was voluntary

because it could reject the deals without imperiling the Enterprises.  The facts here, therefore, are diametrically opposed to the circumstances in A & D Auto that the Federal Circuit suggested may support coercion because the automobile dealers faced insolvency if they did not accede to the financing terms.  See 748 F.3d at 1145.  Second, the FHFA-C's lack of protestation is informative.  "[T]he very fact that FHFA[-C] itself [did] not br[ing] suit to enjoin the Treasury from the alleged coercion it was subjected to suggest[s] that FHFA[-C] was an independent, willing participant in its negotiations with the Treasury."  Robinson v. Fed. Hous. Fin. Agency, 223 F. Supp. 3d 659, 668 (E.D. Ky. 2016), aff'd, 876 F.3d at 220.  The court's conclusion is bolstered by the fact that another court has held that materially similar allegations to those at issue here did not "come close to a reasonable inference that [the] FHFA[-C] considered itself bound to do whatever Treasury ordered."  Perry Capital LLC v. Lew, 70 F. Supp. 3d 208, 226 (D.D.C. 2014) ("Perry I"), aff'd in part, rev'd in part sub nom. Perry II, 864 F.3d at 591.  This court agrees with the reasoning in Perry I:  The PSPA Amendments were executed by sophisticated parties, and many agreements arise from a party's proposal being accepted by the other party.  Id.

### c.  Plaintiffs have not established that the FHFA coerced the FHFA-C into approving the PSPA Amendments.

Plaintiffs also have not alleged facts reflecting that the FHFA coerced the FHFA-C into agreeing to the PSPA Amendments.  As an initial matter, plaintiffs have not alleged that the FHFA unduly influenced the FHFA-C's decision-making process with respect to the proposed agreements.  They merely allege that the FHFA did not silo its regulatory and conservator roles.  The lack of a firewall (without more), however, does not indicate that the FHFA deprived the FHFA-C of meaningful choice.  Moreover, plaintiffs' focus on the FHFA-C allegedly pursuing government objectives when it approved the PSPA Amendments is a red herring.  The purported pursuit of government objectives is not germane to the coercion inquiry because it does not suggest that the FHFA-C lacked any choice in the matter.  Even if it was relevant to coercion (or to some other theory for jurisdiction), plaintiffs would not prevail because Congress permitted the FHFA-C to act in the interests of the government.  See 12 U.S.C. § 4617(b)(2)(J) (allowing the FHFA-C to "take any action" that "is in the interests of the [Enterprises] or the [FHFA]").  The mere pursuit of government objectives, therefore, would not reflect a blending of any roles but rather the FHFA-C using powers afforded to it by Congress.

In conclusion, plaintiffs have not established that the FHFA-C was coerced into approving the PSPA Amendments by Treasury or the FHFA.

### 4.  The FHFA-C is not Treasury's agent.

Plaintiffs further argue that that the FHFA-C's actions are attributable to the United States because the FHFA-C is Treasury's agent.  Plaintiffs assert that the FHFA-C is a government agent because (1) Treasury, by virtue of the PSPAs, had a major role in conservator decisions; (2) the FHFA-C approved the PSPA Amendments for the taxpayers' benefit; and (3) the FHFA-C could not have approved the amendments absent statutory authority.  Defendant

counters that plaintiffs have not pleaded an agency relationship because Treasury does not control the FHFA-C's operations and is statutorily barred from exercising such control.

The United States is subject to claims in this court for the actions of a third party "if [that] party is acting as the government's agent . . . ." A & D Auto, 748 F.3d at 1154. "An essential element of agency is the principal's right to control the agent's actions." Hollingsworth v. Perry, 570 U.S. 693, 713 (2013) (quoting Restatement (Third) of Agency § 1.01 cmt. f (Am. Law. Inst. 2005)); accord O'Neill v. Dep't of Hous. & Urban Dev., 220 F.3d 1354, 1360 (Fed. Cir. 2000) (acknowledging that the common-law meaning of agency requires, among other things, that the principal has the right to control the agent's conduct); see also Preseault v. United States, 100 F.3d 1525, 1537 (Fed. Cir. 1996) (concluding that a state's actions were attributable to the United States when the state acted pursuant to the Interstate Commerce Commission's order); Hendler v. United States, 952 F.2d 1364, 1378-79 (Fed. Cir. 1991) (attributing a state's actions to the United States when the state acted under authority flowing from an Environmental Protection Agency order). The facts, as alleged, do not reflect that Treasury controlled the FHFA-C's actions because Congress explicitly precluded the FHFA-C from being subservient to another agency, 12 U.S.C. § 4617(a)(7) (providing that the FHFA-C cannot be subject to the "direction or supervision" of any other agency), and plaintiffs have not alleged facts indicating that Treasury exercised such control notwithstanding the statutory bar. Although the FHFA-C was required by the PSPAs to obtain Treasury's approval for certain actions (e.g., issuing dividends), the PSPAs did not provide Treasury with the right to unilaterally order amendments. Moreover, plaintiffs describe an FHFA-C that made decisions independently; Treasury "urg[ed]" the FHFA to pursue conservatorship and "push[ed]" for the PSPA Amendments. 2d Am. Compl. ¶¶ 4, 126. Simply stated, plaintiffs have not alleged facts establishing that Treasury exercised the control over the FHFA-C that is necessary for an agency relationship.

### 5. The FHFA-C is the United States because the FHFA-C retains the FHFA's governmental character.

Finally, plaintiffs contend that the FHFA-C is itself a government actor. Defendant disagrees. First, relying on O'Melveny & Myers v. FDIC, 412 U.S. 79 (1994), defendant argues that the FHFA-C is not the United States because the FHFA-C stands in the Enterprises' shoes. Specifically, defendant asserts that Congress's decision to have the FHFA-C succeed to the Enterprises' rights reflects that Congress intended that the FHFA-C step into the Enterprises' private shoes and shed its government character. Second, defendant argues that the FHFA-C's exercise of nontraditional conservatorship powers is immaterial because Congress can expand the conservator's role without transforming it into it into a government actor. Third, defendant argues that the Enterprises are not government instrumentalities—which means that the FHFA did not step into the shoes of a government actor when it became the Enterprises' conservator—because the government does not retain permanent authority to appoint the Enterprises' directors. Defendant contends that the government only has temporary, albeit indefinite, control over the Enterprises because conservatorships are not permanent.

In response, plaintiffs dispute the premise of defendant's argument that, pursuant to O'Melveny, the FHFA becomes the Enterprises when acting as conservator. Plaintiffs assert that O'Melveny does not concern whether an entity is the United States or, if the decision can be read

as addressing that issue, is distinguishable because it concerns receivers or is limited to conservators exercising traditional conservator powers.  Second, plaintiffs argue that the FHFA has not shed its government status, even if it has stepped into the Enterprises' shoes, when it acts as conservator.  Specifically, plaintiffs assert that the FHFA-C retains the FHFA's government status because (1) the FHFA-C has acted beyond the traditional conservator powers and (2) Congress expressed its intention for that result by precluding the conservator from being subject to the supervision of "any other agency."  12 U.S.C. § 4617 (emphasis added).  Third, plaintiffs argue that their claims are against the United States, even if the FHFA-C steps into the shoes of the Enterprises, because the Enterprises are government instrumentalities.

In short, the parties disagree over the government status of the FHFA-C.  The FHFA is indisputably the United States, see 12 U.S.C. § 4511(a) (establishing the FHFA as an "independent agency of the Federal Government"), and so the only question is whether the FHFA sheds that status when it acts as conservator.  In other jurisdictions, courts have held (with near unanimity) that the FHFA loses its government status pursuant to O'Melveny.  In O'Melveny, the United States Supreme Court ("Supreme Court") explained that the FDIC "steps into [the] shoes" of a private company when acting as receiver and sheds its government character because the FDIC "succeed[s] to . . . all rights, titles, powers, and privileges of the [entity in receivership] . . . ."  512 U.S. at 86 (quoting 12 U.S.C. § 1821(d)(2)(A)(i)); see also AG Route Seven P'ship v. United States, 57 Fed. Cl. 521, 534 (2003) (citing O'Melveny for the proposition that the FDIC as receiver is a "private party, and not the government per se" because it "is merely standing in the shoes . . . of the defunct thrift").  The courts drawing from O'Melveny have concluded that the FHFA steps into the shoes of the Enterprises and sheds its government character when acting as conservator because Congress provided that the FHFA-C exercises the same rights with respect to the Enterprises as Congress granted to the FDIC as receiver.  See, e.g., Herron v. Fannie Mae, 861 F.3d 160, 169 (D.C. Cir. 2017); cf. Ameristar Fin. Servicing Co. v. United States, 75 Fed. Cl. 807, 811 (2007) (concluding, with respect to the FDIC, that the step-into-the-shoes principle set forth in O'Melveny also applies in the conservator context).

## a. The FHFA-C is not the United States if the FHFA steps into the Enterprises' shoes when acting as conservator.

Plaintiffs initially contend that defendant's reliance on O'Melveny is a red herring because, assuming that O'Melveny applies, the FHFA-C is the United States even though it steps into the Enterprises' shoes.  Specifically, plaintiffs assert that the FHFA-C is the United States under the facts alleged because (1) the FHFA-C exercises nontraditional conservator powers, (2) Congress intended that the FHFA-C retain the FHFA's government status, and (3) the FHFA-C steps into the shoes of a government instrumentality.  The court addresses each assertion in turn.

First, the FHFA-C did not become a government actor by exercising powers beyond those traditionally afforded to a conservator.  As a threshold matter, plaintiffs have not alleged facts reflecting that the FHFA-C used such powers; the execution of the PSPA Amendments was a "quintessential conservatorship" function.  Perry II, 864 F.3d at 607; see also supra Section IV.B.2 (discussing the FHFA-C's exercise of its powers).  More importantly, however, plaintiffs

would not prevail even if the FHFA-C exercised nontraditional conservatorship powers in agreeing to the PSPA Amendments.  When this argument was pressed in other jurisdictions, it was rejected:

> It may well be true that FHFA's actions would not be allowed under traditional principles of corporate or conservatorship law, but it does not follow that those actions are therefore governmental.  Legislatures can expand conservatorship and similar powers without transforming conservators into agents of the government.  Cf. Pegram v. Herdrich, 530 U.S. 211, 225-26 (2000) (explaining that the Employee Retirement Income Security Act altered the common law of trusts to permit certain actions that would otherwise violate the trustee's fiduciary duties).

Bhatti v. Fed. Hous. Fin. Agency, 332 F. Supp. 3d 1206, 1226 (D. Minn. 2018) (footnote omitted).  The court agrees with that reasoning, and plaintiffs provide no authority that supports a contrary result.  Although plaintiffs state that the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") decision in Waterview Management Co. v. FDIC, 105 F.3d 696 (D.C. Cir. 1997), supports their position, they are mistaken.  Waterview is not on point because the D.C. Circuit did not hold that a conservator or any State is per se the United States when acting pursuant to a congressional grant of broad powers.  Rather, it held that, as a matter of statutory interpretation, the existence of a receivership did not preempt a prereceivership contract.  Id. at 699-702.

Second, Congress's instruction that the FHFA-C is not subject to the supervision of any other agency does not reflect congressional intent for the FHFA to retain its government status when acting as conservator even if it steps into the shoes of the Enterprises.  Because the court only reaches this issue by assuming that O'Melveny is instructive, the statutory language concerning supervision of the FHFA-C does not support a finding of jurisdiction because the same language is present in the statute that the Supreme Court addressed in O'Melveny.  See 512 U.S. at 85-86 (discussing 12 U.S.C. § 1821).  Compare 12 U.S.C. § 1821(c)(3)(C) ("When acting as conservator or receiver . . . , [the FDIC] shall not be subject to the direction or supervision of any other agency or department of the United States or any State in the exercise of the [FDIC's] rights, powers, and privileges."), with id. § 4617(a)(7) ("When acting as conservator or receiver, the [FHFA] shall not be subject to the direction or supervision of any other agency of the United States or any State in the exercise of the rights, powers, and privileges of the [FHFA].").

The third argument advanced by plaintiffs—that the FHFA-C is the United States because it steps into the shoes of a government instrumentality—also is not meritorious.  A government instrumentality's actions are attributable to the United States for purposes of the Tucker Act.  See Corr v. Metro. Wash. Airports Auth., 702 F.3d 1334, 1336 (Fed. Cir. 2012) (noting that a claim against a government instrumentality is a claim against the United States for purposes of the Little Tucker Act, 28 U.S.C. § 1346(a)(2)).  The Supreme Court established in Lebron v. National Railroad Passenger Corp. that a company is a government instrumentality when (1) it is created by "special law," (2) it is established "for the furtherance of governmental objectives," and (3) the federal government "retains for itself permanent authority to appoint a majority of the [company's] directors . . . ."  513 U.S. 374, 400 (1995).  After Lebron, the

Supreme Court clarified that, for purposes of the instrumentality test, "the practical reality of federal control and supervision prevails over Congress' disclaimer of the [the entity's] governmental status." Dep't of Transp. v. Ass'n of Am. R.Rs., 135 S. Ct. 1225, 1233 (2015).

There is no dispute that the Enterprises satisfy the first two prongs of the Lebron test; Congress created the Enterprises by special law to achieve governmental objectives related to the housing market.  See 12 U.S.C. § 4501; see also Herron, 861 F.3d at 167 (addressing claims involving Fannie and noting that "[t]his case satisfies the first two Lebron criteria"); Am. Bankers Mortg. Corp. v. Fed. Home Loan Mortg. Corp., 75 F.3d 1401, 1406-07 (9th Cir. 1996) (reaching same conclusion for Freddie).  The status of the Enterprises, therefore, turns on the third prong:  whether the government retains permanent authority to appoint a majority of the Enterprises' directors.

The Federal Circuit has not addressed the government-control prong with respect to the Enterprises, but courts in other jurisdictions have done so.  Those decisions provide a starting point for the court.  It appears that every court to consider the issue, with the exception of one district court, has held that the government does not exercise permanent control over the Enterprises.  Sisti v. Fed. Hous. Fin. Agency, 324 F. Supp. 3d 273, 279 (D.R.I. 2018) (concluding that the government retains permanent authority to control the Enterprises after noting that "[t]he non-controlling precedent to date" has reached the opposite conclusion).  Most of the courts that concluded that the government lacks permanent control over the Enterprises issued their decisions before the Supreme Court in Association of American Railroads emphasized the importance of evaluating the practical reality over nomenclature, and the other courts focused on the statutory purpose for the conservatorships rather than the Enterprises' actual situation.  E.g., Herron, 861 F.3d at 169 (relying on the notion that a conservatorship is fundamentally temporary).  In other words, the courts adopting the prevailing view considered the issue of control without regard for the Supreme Court's instruction to focus on the practical reality.  The court, therefore, does not find those decisions persuasive.

The crux of the inquiry, as the Supreme Court mandates, is on the practical reality of the government's control over the Enterprises.  Ass'n of Am. R.Rs., 135 S. Ct. at 1233.  It is of no import that Congress nominally authorized a facially temporary conservatorship, see 12 U.S.C. § 4617(a) (permitting the FHFA to act as conservator to "reorganiz[e]" or "rehabilitat[e]" the Enterprises), because Congress's disclaimers are no substitute for the court's obligation to assess the government's actual control, Ass'n of Am. R.Rs., 135 S. Ct. at 1233.  The court focuses on the length of the conservatorship because the FHFA-C wields complete control over the Enterprises so long as they are in conservatorship.  See generally 12 U.S.C. § 4617.

Plaintiffs allege that the Enterprises will remain undercapitalized—and thus subject to conservatorship pursuant to 12 U.S.C. § 4617(a)(3)(J)—until the PSPAs, in their current form, are changed because the Enterprises cannot accumulate any capital under the existing terms of the PSPAs.  Although the PSPAs could be further amended, plaintiffs' allegations reflect that Treasury and the FHFA-C will not do so because the purpose of the PSPA Amendments is to prevent the Enterprises from accumulating the necessary capital to become independent companies.  Plaintiffs, in short, have alleged that the government intended, and has taken steps to ensure, that the conservatorships never end.  Those facts, viewed in isolation, would support a

conclusion that the practical reality is that the Enterprises are under permanent government control. The court's inquiry, however, is not limited to plaintiffs' allegations because it has taken judicial notice of relevant facts reflecting that the status quo has changed: The Treasury Secretary and the FHFA Director are now both committed to ending the conservatorships. Moreover, the idea that the Enterprises are permanently subject to government control because they can never accumulate the capital needed to exit the conservatorships is undermined by recent developments. Indeed, Treasury proposed amending the Net Worth Sweep to allow the Enterprises to retain more capital, and the FHFA Director testified during his confirmation hearing that, if confirmed, he would seek to increase the amount of capital that the Enterprises retain. Simply stated, the practical reality is that the Enterprises are not subject to permanent government control because the relevant parties are working to terminate the conservatorships.[18]

In sum, the FHFA-C does not become the United States if the FHFA steps into the Enterprises' shoes when serving as conservator.

**b. The FHFA-C retains the FHFA's government character because the FHFA-C does not step into the Enterprises' shoes.**

The key inquiry, therefore, is whether the FHFA steps into the shoes of the Enterprises when acting as conservator. Defendant argues that the FHFA-C sheds its government character and assumes the identity of the Enterprises based on the reasoning in O'Melveny. Defendant's reliance on O'Melveny is misplaced. O'Melveny concerns a receiver stepping into the shoes of a failed bank. 512 U.S. at 86. The roles of a conservator and receiver are meaningfully different. In a recent decision, the United States District Court for the District of Rhode Island artfully explained the differences and their import for assessing whether the FHFA-C is the government:

> The O'Melveny Court held that FDIC, when acting as a receiver for a private entity, steps into the shoes of that private entity for state law claims. This holding makes sense given the purpose of receivership: "to preserve a company's assets, for the benefit of creditors, in the face of bankruptcy." When FDIC is appointed receiver, it must dispose of the received entity's assets, resolving obligations and claims made against the entity. Notably, "[i]n receivership, the receiver owes fiduciary duties to the creditors, which the corporation would otherwise owe to

---

[18] Plaintiffs may disagree with the court's conclusion that events occurring after the PSPA Amendments are relevant to determining whether the Enterprises were under permanent government control during the events discussed in plaintiffs' complaint. Even if the court agreed that events occurring after the PSPA Amendments are not germane, plaintiffs still would not prevail because they allege that the conservatorships began as temporary measures. See 2d Am. Compl. ¶¶ 47 ("FHFA also emphasized that the conservatorship was temporary: 'Upon the [FHFA] Director's determination that the [FHFA-C's] plan to restore the [Enterprises] to a safe and solvent condition has been completed successfully, the Director will issue an order terminating the conservatorships'" (quoting FHFA publication)), 90 (noting that, when the conservatorships were imposed, the FHFA Director "vowed" that the Enterprises would "exit conservatorship" and return to "normal business operations"). Thus, the Enterprises were not under permanent government control before the PSPA Amendments.

creditors during a period of insolvency." It logically follows, then, that the receiver steps into the shoes of the private entity, because it assumes the fiduciary duties of that entity.

Conservatorship, in contrast, serves a different function. FHFA has described the purpose of conservatorship is "to establish control and oversight of a company to put it in a sound and solvent condition." Conservators, unlike receivers, have a fiduciary duty running to the corporation itself.

This is "critically distinct" from the fiduciary duties owed as a receiver— the receiver does indeed "step into the shoes" of the entity by assuming the fiduciary duties of the entity, but the conservator does not: it remains distinct, and rather owes a duty to the entity. Given the difference in fiduciary duties, O'Melveny's "steps into the shoes" holding makes sense in the context of receivership, but not in the context of conservatorship.

Sisti, 324 F. Supp. 3d at 282-83 (citations and footnotes omitted). See generally Brian Taylor Goldman, The Indefinite Conservatorship of Fannie Mae and Freddie Mac Is State-Action, 17 J. Bus. & Sec. L. 11, 23-30 (2016). The district court, relying on the above analysis, declined to treat the FHFA-C as a private actor. Sisti, 324 F. Supp. 3d at 284. This court agrees with the reasoning and conclusion in Sisti: The FHFA does not shed its government character when acting as conservator because it does not step into the shoes of the Enterprises. Otherwise stated, the FHFA-C is the United States because it retains the FHFA's government character. Plaintiffs' claims, therefore, are against the United States for purposes of the Tucker Act.

### C. The court lacks jurisdiction over plaintiffs' claim that sounds in tort.

#### 1. Plaintiffs' fiduciary duty claim sounds in tort.

Defendant next argues that the court lacks jurisdiction over plaintiffs' fiduciary duty claim because the United States does not owe to each Enterprise's shareholders a fiduciary duty that is grounded in a statute or contract. Defendant asserts that such a fiduciary duty cannot be based on (1) HERA because, pursuant to the statute, the FHFA-C is only required to act in the government's and the Enterprises' best interests; or (2) the PSPAs because plaintiffs are not parties to those contracts. Plaintiffs counter that their claim is based on a fiduciary duty rooted in both HERA and the PSPAs. As to HERA, plaintiffs assert that Congress made the FHFA-C a fiduciary by authorizing it to control the Enterprises, entrusting it with duties that are at the core of what it means to be a fiduciary, and using terminology—"conservator"—associated with a fiduciary. Additionally, plaintiffs contend that recognizing that Treasury owes a fiduciary duty to shareholders is the only way to give meaning to Congress's mandate in HERA that Treasury protect taxpayers by considering, before purchasing securities, the need to maintain the Enterprises as privately owned entities. With respect to the PSPAs, plaintiffs argue that Treasury owes a fiduciary duty to the shareholders because it acquired control rights under the contract.

The court, pursuant to the Tucker Act, lacks jurisdiction over tort claims. 28 U.S.C. § 1491(a)(1). A breach of fiduciary duty is generally classified as a tort. Newby v. United

States, 57 Fed. Cl. 382, 294 (2003).  A fiduciary duty claim, however, does not sound in tort for purposes of the Tucker Act when the fiduciary relationship is founded on a money-mandating statute or a contractual provision between the claimant and United States.  See Hopi Tribe v. United States, 782 F.3d 662, 667 (Fed. Cir. 2015) (statute); Cleveland Chair Co. v. United States, 557 F.2d 244, 246 (Ct. Cl. 1977) (contract); see also 28 U.S.C. § 1491(a)(1) (providing jurisdiction over claims "founded upon . . . any Act of Congress . . . or contract with the United States").

The initial issue is whether HERA establishes a fiduciary relationship between the FHFA-C and the Enterprises' shareholders.  The court begins with the language of the statute. Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999).  "If Congress has expressed its intention by clear statutory language, that intention controls and must be given effect."  Rosete v. Office of Pers. Mgmt., 48 F.3d 514, 517 (Fed. Cir. 1995); accord Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.").  Congress provided in HERA that the FHFA-C is only required to act in the interests of itself or the Enterprises.  12 U.S.C. § 4617(b)(2)(J). That statement reflects a clear intent:  The FHFA-C does not owe a fiduciary duty to shareholders because the conservator is not required to consider shareholders' interests.[19]  See id.; see also Collins, 938 F.3d at 580 (noting that HERA "may permit" the FHFA-C to pursue actions that are "inconsistent with fiduciary duties").  The plain language controls, and therefore the court does not consider the peripheral considerations urged by plaintiffs such as the implications of the word "conservator," the FHFA-C's control over the Enterprises, or the FHFA-C's other powers.  In sum, plaintiffs cannot establish jurisdiction for their direct fiduciary duty claim by relying on HERA.

The next issue is whether Treasury owes a fiduciary duty to shareholders because it purchased securities pursuant to HERA.[20]  Plaintiffs contend that Treasury assumed such a duty

---

[19]  The court's interpretation of HERA's plain language is buttressed by the fact that Congress seemingly made a deliberate decision to exclude shareholder interests from the FHFA-C's considerations.  Congress modeled HERA on the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA").  Jacobs, 908 F.3d at 893.  Under FIRREA, Congress permitted the FDIC as conservator to consider the best interests of a bank, its depositors, or the FDIC.  12 U.S.C. § 1821(d)(2)(J)(ii).  Although Congress permitted the FDIC to take into consideration the interests of its depositors, Congress omitted the analogue of depositors— shareholders—from the list of germane interests that the conservator can consider when acting pursuant to HERA.  Compare id. (FIRREA), with 12 U.S.C. 4617(b)(2)(J) (HERA).  The omission is telling.

[20]  The gravamen of plaintiffs' fiduciary duty claim is that the FHFA-C owed a fiduciary duty to plaintiffs.  See 2d Am. Compl. ¶¶ 151-60.  Indeed, plaintiffs state in their complaint that the "FHFA violated its fiduciary duty," id. ¶ 160, and make no similar allegation with regard to Treasury.  Although plaintiffs have not alleged that their fiduciary duty claim is premised on Treasury's actions, the court nonetheless considers the parties' arguments on whether such a claim would be within the court's jurisdiction for two reasons.  First, the parties have fully briefed the issue without noting the discrepancy between plaintiffs' arguments and the allegations in their second amended complaint.  Second, the court's resolution of the issue is

when it agreed to the PSPAs because of the determinations that Congress required the Treasury Secretary to make prior to buying the securities.  Before purchasing securities pursuant to HERA, the Secretary is required to determine that the purchase is necessary to protect taxpayers and evaluate various considerations in connection with protecting the taxpayers.  12 U.S.C. §§ 1455(*l*)(1)(B)-(C), 1719(g)(1)(B)-(C).  One of those considerations is the need to maintain the Enterprises as privately owned companies.  Id. §§ 1455(*l*)(1)(C), 1719(g)(1)(C).  At no point, however, did Congress direct (or even suggest) that the Secretary must protect the shareholders.  The court declines to stretch the statutory language to support a fiduciary relationship based on any incidental benefit shareholders may derive from the Secretary considering the need to keep the Enterprises privately owned in the context of protecting taxpayers.  Simply stated, Treasury did not assume any fiduciary obligations to the Enterprises' shareholders by virtue of HERA.

Finally, the court turns to whether Treasury owed a fiduciary duty to the Enterprises' other shareholders because it acquired control rights by agreeing to the PSPAs.  Plaintiffs' argument is premised on the state-law principle (which they term "general corporate law") that a controlling shareholder owes a fiduciary duty to the minority shareholders.  The court is not convinced.  First, plaintiffs' allegation of a fiduciary relationship is not founded on a contract within the meaning of the Tucker Act.  Plaintiffs are not attempting to enforce any duty imposed on Treasury that is specified in the PSPAs.  They invoke the contracts solely to establish that Treasury is a controlling shareholder and rely on that conclusion to argue that it has a fiduciary duty based on state law.  The contract, otherwise stated, is one step removed from the purported genesis of the fiduciary duty—the application of state-law principles.  That gap is too much in light of the court's obligation to narrowly construe the Tucker Act's waiver of sovereign immunity.  See Smith, 855 F.2d at 1552 (noting that the Tucker Act is narrowly construed); see also Perry II, 864 F.3d at 619-20 (rejecting the legal theory that the Enterprises' shareholders' need to reference the PSPAs for their fiduciary duty claim was enough to conclude that the claim was rooted in a contract for purposes of the Tucker Act).

Second, plaintiffs fail to demonstrate the applicability of the state-law principles underlying their theory for why Treasury assumed fiduciary duties.  Federal law governs the obligations Treasury incurred by entering into the PSPAs.  See Boyle v. United Techs. Corp., 487 U.S. 500, 519 (1988) ("The proposition that federal common law continues to govern the 'obligations to and rights of the United States under its contracts' is nearly as old as Erie [v. Tompkins, 304 U.S. 64 (1938),] itself.").  Although courts may shape federal law by drawing from state-law principles, plaintiffs do not explain why doing so is appropriate in this instance.

Third, plaintiffs do not prevail even if their fiduciary duty claim could be founded on a contract and federal common law incorporates the state-law principles regarding controlling shareholders' fiduciary obligations.  Under Delaware and Virginia law, a controlling shareholder owes a fiduciary duty to the minority shareholders.  See Ivanhoe Partners v. Newmont Min. Corp., 535 A.2d 1334, 1344 (Del. 1987); Parsch v. Massey, 79 Va. Cir. 446 (2009); see also Quadrant Structured Prod. Co. v. Vertin, 102 A.3d 155, 183 (Del. Ch. 2014) (acknowledging that

---

immaterial to the ultimate outcome because, as discussed below, plaintiffs lack standing to pursue their claims.

those "who effectively control a corporation" owe a fiduciary duty to others).[21]   To have the requisite level of control, the controlling shareholder must (1) be able to exercise a majority of the corporation's voting power or (2) direct the corporation without owning a majority of stock. Kahn v. Lynch Comm'n Sys., 638 A.2d 1110, 1113 (Del. 1994).   The latter, effective exercise of control, "is not an easy test to satisfy"; the individual or group must be, "as a practical matter, . . . no differently situated than if they had majority voting control."   In re PNB Holding Co. S'holders Litig., No. CIV.A. 28-N, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006). Plaintiffs have not established that Treasury meets either control test.   First, plaintiffs do not allege that Treasury owns any of the Enterprises' voting stock.   Treasury purchased preferred stock and acquired the right to buy common (i.e., voting) stock, but there is no indication that Treasury exercised its warrants or otherwise acquired common stock.[22]   Second, plaintiffs do not demonstrate that Treasury exercised effective control over the Enterprises.   Although Treasury acquired the right to preclude the Enterprises from taking certain actions, Treasury did not control the Enterprises because it could not direct any action—it could only respond to certain requests made by the Enterprises.   As a practical matter, therefore, Treasury is situated differently than if it had majority voting power.

   In sum, plaintiffs' fiduciary duty claim is a tort claim because plaintiffs have not established that the FHFA-C or Treasury owed shareholders a fiduciary duty based on a statute or contract.   The court, therefore, dismisses count III—breach of fiduciary duty—because it lacks jurisdiction over tort claims.

### 2.  Plaintiffs' takings and illegal-exaction claims do not sound in tort.

   Defendant also argues that plaintiffs' Fifth Amendment takings and illegal-exaction claims sound in tort because they are premised on purported misconduct by the FHFA-C. Plaintiffs counter that they have pleaded the predicates for takings and illegal-exaction claims, which means that it is irrelevant whether they also alleged facts that are germane to tortious actions.

   When a party pleads the predicates for a takings claim or illegal-exaction claim, the court possesses jurisdiction to entertain such claims.   See Hansen v. United States, 65 Fed. Cl. 76, 80-81 (2005) ("[S]o long as there is some material evidence in the record that establishes the predicates for a [claim covered by the Tucker Act,] . . . a plaintiff succeeds in demonstrating

---

[21]   The court refers to Delaware and Virginia law because Fannie is a Delaware corporation, and Freddie is a Virginia corporation.   When evaluating Virginia law, the court also looks to Delaware state court decisions because Virginia courts do so to resolve unsettled issues in the Commonwealth.   E.g., U.S. Inspect Inc. v. McGreevy, No. 160966, 2000 WL 33232337, at *4 (Va. Cir. Ct. Nov. 27, 2000).

[22]   Even if Treasury had exercised its option to buy a majority of the voting stock, it would not be a controlling shareholder because the FHFA-C succeeded to all of the shareholders' rights.   See 12 U.S.C. § 4617(b)(2)(A) (noting that the FHFA-C, by operation of law, succeeds to all rights and powers of any Enterprise shareholder).   Treasury, therefore, would have no voting power.

subject matter jurisdiction in this court . . . .").  Those claims, at a basic level, are contentions that the government expropriated private property lawfully (takings) or unlawfully (illegal exaction).  See Orient Overseas Container Line (UK) Ltd. v. United States, 48 Fed. Cl. 284, 289 (2000) ("Takings claims arise because of a deprivation of property that is authorized by law.  Illegal exactions arise when the government requires payment in violation of the Constitution, a statute, or a regulation." (citing Dureiko v. United States, 209 F.3d 1345, 1359 (Fed. Cir. 2000); Eastport S.S. Corp. v. United States, 372 F.2d 1002, 1007-08 (Ct. Cl. 1967))).  If a party alleges the necessary predicates for these claims, the court is not deprived of jurisdiction even if the complaint contains allegations that could support a tort claim.  See El-Shifa Pharm. Indus. Co. v. United States, 378 F.3d 1346, 1353 (Fed. Cir. 2004) ("That the complaint suggests the United States may have acted tortiously towards the appellants does not remove it from the jurisdiction of the Court of Federal Claims."); Rith Energy, Inc. v. United States, 247 F.3d 1355, 1365 (Fed. Cir. 2001) (explaining that this court has jurisdiction over a takings claim "even if the government's action was subject to legal challenge on some other ground").  Here, plaintiffs plead the predicates for takings and illegal-exaction claims by alleging, in essence, that they were forced to give their property to the government because of lawful or unlawful government conduct.  Therefore, it is of no import to the court's jurisdiction whether plaintiffs have alleged facts that would also support a tort claim.

### D.  The court lacks jurisdiction over plaintiffs' implied-in-fact-contract claim because plaintiffs are not third-party beneficiaries of such a contract.

Defendant argues next that the court lacks jurisdiction to entertain plaintiffs' implied-in-fact-contract claim because plaintiffs are not third-party beneficiaries of such a contract.  Specifically, defendant asserts that plaintiffs have not established that they are intended beneficiaries independent of their status as shareholders and that any benefit that is related to their status as shareholders is insufficient for jurisdiction.  Plaintiffs counter that they are intended third-party beneficiaries of implied contracts, between the FHFA and each Enterprise's board, in which the boards consented to the conservatorships in exchange for the FHFA-C operating the Enterprises as a fiduciary and returning them to sound condition.  Specifically, plaintiffs assert that the intent to benefit the shareholders is evident from (1) the boards' consent to the conservatorships because shareholders would benefit from a conservator focused on returning the Enterprises to a better condition, and (2) the government acknowledging that the Enterprises' stock would remain outstanding while the Enterprises were in conservatorship.

The court's jurisdiction over contract claims is limited by the Tucker Act.  Ransom v. United States, 900 F.2d 242, 244 (Fed. Cir. 1990).  Of particular import here, ordinarily, a plaintiff must be in privity of contract with the United States to invoke this court's jurisdiction over a contract claim against the government.  Fid. & Guar. Ins. Underwriters, Inc. v. United States, 805 F.3d 1082, 1087 (Fed. Cir. 2015).  But privity is not required if "the plaintiff can demonstrate that it was an intended third-party beneficiary under the contract."  Pac. Gas & Elec. Co. v. United States, 838 F.3d 1341, 1361 (Fed. Cir. 2016).

"Third party beneficiary status is an 'exceptional privilege.'"  Glass v. United States, 258 F.3d 1349, 1354 (Fed. Cir. 2001) (quoting German All. Ins. Co. v. Home Water Supply Co., 226 U.S. 220, 230 (1912)).  The conditions for attaining such status are "stringent."  Anderson v.

United States, 344 F.3d 1343, 1352 (Fed. Cir. 2003). "[S]hareholders seeking status to sue as third-party beneficiaries of an allegedly breached contract must 'demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly.'" Castle v. United States, 301 F.3d 1328, 1338 (Fed. Cir. 2002) (quoting Glass, 258 F.3d at 1354). Specifically, "the contract must express the intent of the promissor to benefit the shareholder personally, independently of his or her status as shareholder." Glass, 258 F.3d at 1353-54. As a practical matter, the shareholder does not personally benefit independent of its status as a shareholder when the contractual promises pertain only to the treatment of the company. See FDIC v. United States, 342 F.3d 1313, 1320 (Fed. Cir. 2003) (noting that the broken promises concerned the treatment of the company such that the plaintiffs did not benefit independent of their status as shareholders); accord Maher v. United States, 314 F.3d 600, 605 (Fed. Cir. 2002) (concluding that the plaintiffs were not third-party beneficiaries when they failed to "establish[] that the government took on any obligations in the merger agreement for [the plaintiffs'] personal benefit, or even that the merger agreement contains any provisions pertaining to [the plaintiffs] personally").

As plaintiffs are not parties to the alleged implied contracts between the FHFA and the Enterprises, the relevant issue is whether plaintiffs are third-party beneficiaries of those agreements. They are not. First, it is of no import that the Enterprises, as plaintiffs argue, purportedly agreed to the conservatorships because that would serve the interests of shareholders. Indeed, "every action of a corporation is supposed to benefit its shareholders," but the "law has not viewed this general benefit as making every shareholder a third-party beneficiary." Suess v. United States, 33 Fed. Cl. 89, 94 (1995). Second, plaintiffs' allegations reflect that they only benefit from the alleged implied contracts by virtue of their shareholder status. The relevant promises concerned how the FHFA-C would operate the Enterprises; the crux of the purported agreements was the FHFA-C promising to operate the Enterprises as a fiduciary to preserve their assets and return them to sound condition. Because the promises in the alleged implied contracts were directed at the Enterprises, plaintiffs cannot be third-party beneficiaries of the alleged contract. See FDIC, 342 F.3d at 1320. Third, plaintiffs have not demonstrated that the FHFA intended that plaintiffs benefit independently of their status as shareholders even if they did so benefit. Plaintiffs rely on the FHFA's statements that private stock would remain outstanding and shareholders would continue to hold an economic interest in their stock. Those factual statements, however, do not reflect that the FHFA intended to confer any specific benefit on plaintiffs independent of their role as shareholders. Because plaintiffs have not alleged facts reflecting that the FHFA intended to confer a personal benefit on them, they are not third-party beneficiaries. See Glass, 258 F.3d at 1353-54. In sum, the court lacks jurisdiction to entertain plaintiffs' implied-in-fact-contract claim because plaintiffs are neither parties to a contact with the government nor third-party beneficiaries of any such agreement. Therefore, the court dismisses count IV.

## V. STANDING

In addition to asserting that the court lacks subject-matter jurisdiction to entertain plaintiffs' claims, defendant challenges plaintiffs' standing to pursue their claims. A plaintiff bears the burden of demonstrating that it has standing for each claim. Starr Int'l Co. v. United States, 856 F.3d 953, 964 (Fed. Cir. 2017). It must establish, among other things, that it is

"assert[ing its] own legal rights and interests, and cannot rest [its] claim[s] to relief on the legal rights or interests of third parties." Kowalski v. Tesmer, 543 U.S. 125, 129 (2004). Further, the label assigned to a claim is irrelevant; it is the substance of the allegations that control. See Allen v. Wright, 468 U.S. 737, 752 (1984) ("[T]he standing inquiry requires careful examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claim asserted."), abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118 (2014). Thus, in a suit brought by shareholders, it is the substance of the allegations and not the label assigned to the allegations— i.e., direct or derivative—that matters. See Starr, 856 F.3d at 966-67; see also In re Sunrise Sec. Litig., 916 F.2d 874, 882 (3d Cir. 1990) ("Whether a claim is [direct] or derivative is determined from the body of the complaint rather than from the label employed by the parties."). A shareholder lacks standing to litigate nominally direct claims that are substantively derivative in nature because its personal request for relief would be based on the rights of the company. See Starr, 856 F.3d at 966-67; see also Weir v. Stagg, No. 09-21745-CIV, 2011 WL 13174531, at *9 (S.D. Fla. Feb. 7, 2011) ("Shareholders do not have standing to bring a direct action for injuries suffered by a corporation, but rather, must bring a derivative action."). A shareholder, therefore, must establish that the claims it labeled as direct are substantively direct in nature—i.e., premised on its injuries rather than the corporation's injuries—to have standing to litigate those claims. See Starr, 856 F.3d at 966-67.

The parties disagree on whether plaintiffs have standing to litigate any of their claims. Defendant argues that plaintiffs lack standing to litigate their claims because the claims belong to the Enterprises and are therefore derivative in nature. Defendant contends that plaintiffs' claims are actually derivative because, to prevail, plaintiffs would need to establish an injury to the Enterprises and any relief would accrue to the Enterprises.

Plaintiffs counter that they assert direct claims because the government (1) targeted private shareholders and (2) discriminated against them by rearranging the Enterprises' capital structure to plaintiffs' detriment, which renders the claims for such conduct both direct and derivative under the dual-nature exception.[23] Defendant replies that the Federal Circuit rejected the notion that a plaintiff states a direct claim by alleging it was targeted by the challenged action. Defendant also contends that the dual-nature exception is not applicable because Treasury was not a controlling shareholder, the Enterprises did not issue new shares, and the PSPA Amendments did not involve the reallocation of power.

Plaintiffs do not satisfy their burden of establishing standing. Neither theory they advance for why those claims are substantively direct, rather than derivative, is persuasive. First, it is of no import whether the government targeted shareholders with the PSPA Amendments. See Starr, 856 F.3d at 973 (noting that plaintiffs did not "sufficiently explain why the

---

[23] Plaintiffs also assert that their claims must be construed as direct claims to vindicate important federal policies if shareholders cannot assert derivative claims because of HERA. But as this court held in Fairholme II, the shareholders of the Enterprises, notwithstanding HERA, have standing to assert derivative claims because of the FHFA-C's conflict of interest. 147 Fed. Cl. at 49-51.

Government's subjective motivations are relevant to the inquiry into direct standing"). The direct-versus-derivative inquiry "turns on the plaintiff's injury, not the defendant's motive." Pagan v. Calderon, 448 F.3d 16, 30 (1st Cir. 2006). Second, plaintiffs have not asserted claims that qualify as both direct and derivative based on the dual-nature exception. The Federal Circuit explained that, pursuant to this exception, shareholder claims may be both direct and derivative "when a 'reduction in [the] economic value and voting power affected the minority stockholders uniquely . . . .'" Starr, 856 F.3d at 968 (quoting Gentile v. Rossette, 906 A.2d 91, 99 (Del. 2006)). Specifically, shareholder claims are both direct and derivative if

> "(1) a stockholder having majority or effective control causes the corporation to issue 'excessive' shares of its stock in exchange for assets of the controlling stockholder that have a lesser value," and "(2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders."

Id. (quoting Gentile, 906 A.2d at 100). The exception does not apply here because Treasury was not a controlling shareholder at the time the PSPA Amendments were executed,[24] the PSPA Amendments did not involve the issuance of new shares, and shareholder voting power was not reallocated under the PSPA Amendments. It is not enough, contrary to plaintiffs' contention, that the government allegedly exacted economic value from the other shareholders by rearranging the corporate structure. See El Paso Pipeline GP Co. v. Brinckerhoff, 152 A.3d 1248, 1264 (Del. 2016) (applying Gentile and holding a plaintiff does not state a direct claim under the dual-nature exception by pleading the "extraction of solely economic value from the minority by a controlling stockholder"). Because plaintiffs have not established that their claims are substantively direct in nature, they cannot demonstrate that they have standing to litigate those claims.

Plaintiffs fare no better if the court moves beyond their arguments for why their claims are substantively direct in nature. Federal law governs whether plaintiffs' claims are direct or derivative. See Starr, 856 F.3d at 965. But, as the parties acknowledge, federal law in this area is informed by Delaware law. Id.; see also Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 97 (1991) (noting the "presumption that state law should be incorporated into federal common law"). Under Delaware law, the test for whether a shareholder's claim is derivative or direct depends on the answers to two questions: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1033 (Del. 2004) (en banc). "Normally, claims of corporate overpayment are . . . regarded as derivative [because] . . . the corporation is both the party that suffers the injury (a reduction in its assets or their value) as well as the party to whom the remedy (a restoration of the improperly reduced value) would flow." Gentile, 906 A.2d at 99, discussed in Starr, 856 F.3d at 965. Such claims are derivative even "though the overpayment may diminish the value of the corporation's stock or deplete corporate assets that might

---

[24] Treasury is not a controlling shareholder for the reasons set forth in Section IV.C.1, supra.

otherwise be used to benefit the stockholders, such as through a dividend." Protas v. Cavanagh, No. CIV.A. 6555-VCG, 2012 WL 1580969, at *6 (Del. Ch. May 4, 2012); see also Hometown Fin. Inc. v. United States, 56 Fed. Cl. 477, 486 (2003) ("[C]ourts have consistently held that shareholders lack standing to bring cases on their own behalf where their losses from the alleged injury to the corporation amount to nothing more than a diminution in stock value or a loss of dividends.").

In their complaint, plaintiffs focus on the expropriation of the Enterprises' assets via compulsory payments of all profits. The gravamen of each claim is the same: The government, via the PSPA Amendments, compelled the Enterprises to overpay Treasury. Regardless of plaintiffs' label (direct or derivative) or theory (taking, illegal exaction, breach of fiduciary duty, or breach of implied contract) for their claims, the claims are substantively derivative in nature because they are premised on allegations of overpayment.[25] See Gentile, 906 A.2d at 99; see also Roberts, 889 F.3d at 409 (explaining that the plaintiffs asserted "classic derivative claims" when they alleged that "the [PSPA Amendments] illegally dissipated corporate assets by transferring them to Treasury"). Plaintiffs cannot transform their substantively derivative claims into direct claims by merely alleging that, as a result of overpayments, they were deprived of their stockholder rights to receive dividends or liquidation payments. The claims remain derivative because plaintiffs' purported "harms are 'merely the unavoidable result . . . of the reduction in the value of the entire corporate entity.'" Protas, 2012 WL 1580969, at *6 (quoting Gentile, 906 A.2d at 99); see also Agostino v. Hicks, 845 A.2d 1110, 1122 (Del. Ch. 2004) ("[T]he inquiry should focus on whether an injury is suffered by the shareholder that is not dependent on a prior injury to the corporation."). Because plaintiffs' claims are derivative in nature, plaintiffs lack standing to pursue those claims on their own behalf.

After the initial round of briefing on defendant's omnibus motion to dismiss was complete, and after Fairholme II was decided and the court held a status conference regarding further proceedings in the related cases, plaintiffs raised a new argument—that the Federal Circuit's decision in First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279 (Fed. Cir. 1999), compels a finding that they have standing to assert their takings and illegal-exaction claims.[26] This particular argument was not timely raised and is waived. See United

<hr>

[25] Plaintiffs would remain unsuccessful if their allegations of waste and mismanagement (styled as self dealing, overreach, or abuse of discretion) were construed to be indicative of some action other than overpayment. Any claims premised on waste and mismanagement are derivative in nature. Kramer v. W. Pac. Indus., Inc., 546 A.2d 348, 353 (Del. 1988) (noting that "mismanagement resulting in corporate waste, if proven represents a direct wrong to the corporation . . . [that] is entirely derivative in nature"). Plaintiffs' claims are also derivative in nature to the extent that they are premised on (1) a purported reduction in share price as a consequence of the Enterprises losing assets or (2) the FHFA-C acting unfairly by agreeing to transfer profits pursuant to the PSPA Amendments. See Hometown, 56 Fed. Cl. at 486 (stock prices); In re Straight Path Commc'ns Inc. Consol. S'holder Litig., No. CV 2017-0486-SG, 2017 WL 5565264, at *4 (Del. Ch. Nov. 20, 2017) ("Sale of corporate assets to a controller for an unfair price states perhaps the quintessential derivative claim . . . .").

[26] As defendant notes, the court did not invite plaintiffs, after the status conference held March 5, 2020, to relitigate issues already decided in Fairholme II.

States v. Ford Motor Co., 463 F.3d 1267, 1277 (Fed. Cir. 2006) (explaining that "[a]rguments raised for the first time in a reply brief are not properly before this court"); Ironclad/EEI v. United States, 78 Fed. Cl. 351, 358 (2007) (noting that "under the law of this circuit, arguments not presented in a party's principal brief to the court are typically deemed to have been waived").

Even if this argument were not waived, the Federal Circuit's Starr decision remains the binding precedent most on point.  The distinction between direct and derivative claims brought by shareholders is the focus of the Federal Circuit's standing analysis.  Starr, 856 F.3d at 963-73. Just as here, the plaintiffs brought takings and illegal-exaction claims related to a government intervention, during a financial crisis, affecting the future of a corporation in which they owned shares.  Id. at 958-61.  Starr provides the test for determining whether such claims are direct or derivative in nature and requires that nominally direct claims—that are actually derivative claims—be dismissed for lack of standing.  Id. at 973.

In face of this binding precedent, the court cannot conclude that the holding in First Hartford regarding direct Fifth Amendment takings claims is more relevant.  It is true that in First Hartford shareholders of a bank in receivership could pursue their takings claims as direct claims against the United States.  194 F.3d at 1287.  However, First Hartford does not address the distinction between direct and derivative claims.  When faced with binding precedent that addresses a crucial distinction, such as Starr, and one that does not, such as First Hartford, the court follows the precedent most on point.  Cf. Union Elec. Co. v. United States, 363 F.3d 1292, 1297 (Fed. Cir. 2004) ("[W]e have repeatedly held that the disposition of an issue by an earlier decision does not bind later panels of this court unless the earlier opinion explicitly addressed and decided the issue." (citing Boeing N. Am., Inc. v. Roche, 298 F.3d 1274, 1282 (Fed. Cir. 2002))).

In sum, plaintiffs have not established that they have standing to litigate their claims because they do not, and cannot, demonstrate that those claims are substantively direct claims. Therefore, the court dismisses plaintiffs' claims on standing grounds to the extent that it has subject-matter jurisdiction over those claims.[27]

---

[27]  As explained above, the court lacks jurisdiction over plaintiffs' claims for breach of fiduciary duty and breach of implied contract.  See supra Sections IV.C.1 (fiduciary duty), IV.D (contract).  In addition, because all of plaintiffs' claims must be dismissed for lack of standing, the court need not reach defendant's remaining arguments that these claims should be dismissed for failure to state a claim upon which relief can be granted.

## VI.  CONCLUSION

For the reasons stated above, the court dismisses plaintiffs' claims because it lacks jurisdiction to entertain their fiduciary duty and implied-in-fact-contract claims, and plaintiffs lack standing to pursue any of their claims.  The court therefore **GRANTS** defendant's motion to dismiss.  The clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**

<u>s/ Margaret M. Sweeney</u>
MARGARET M. SWEENEY
Chief Judge